UNITED STATES of America,
Plaintiff–Appellee,

v.

Bernard ALTAMIRANO,
Defendant–Appellant.

No. 79–1743.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 14, 1980.

Decided Oct. 17, 1980.

Rehearing Denied Dec. 8, 1980.

James F. Hewitt, Federal Public Defender, San Francisco, Cal., argued, for defendant–appellant.

G. William Hunter, U.S. Atty., Sanford Svetcov, Chief Asst. U.S. Atty., D. Michael Nerney, Asst. U.S. Atty., Sharon Redel, Research Asst., University of San Francisco School of Law, San Francisco, Cal., for plaintiff–appellee.

Before WRIGHT and SNEED, Circuit Judges, and FRYE *, District Judge.

SNEED, Circuit Judge:

Appellant was charged by indictment with four counts of distribution of heroin, 21 U.S.C. § 841(a)(1), two counts of assault on a federal officer with a deadly weapon, 18 U.S.C. §§ 111, 1114, and one count of being an ex–felon in possession of a firearm, 18 U.S.C. App. § 1202(a)(1). Appellant pleaded not guilty to all counts and at the conclusion of his trial the jury found him guilty on all counts. Initially he was sentenced to thirty–five years of imprisonment, but shortly thereafter his sentence was reduced to thirty years of confinement together with a seven–year parole term and a $15,000 fine with respect to a distribution of heroin count.

Appellant, presently represented by the Federal Public Defender, appeals his conviction on the ground that his trial counsel's incompetence was sufficient under the circumstances existing at trial to require a reversal of appellant's conviction and a remand for a new trial without regard to whether appellant can show that he was prejudiced by counsel's incompetence. Appellant also argues that he was in fact prejudiced by his counsel's incompetence. The government argues that to secure the reversal and remand the appellant seeks he must show prejudice and that it cannot be shown to exist on the basis of the present record.

We have reviewed the record and the transcript of the trial and affirm the appellant's conviction.

I.

FACTS AND CONDUCT OF
APPELLANT'S COUNSEL

It is not possible to state within a reasonably short space all the facts relevant to our disposition of this case. Only a reproduction of the entire transcript of the trial would be sufficiently comprehensive. We shall content ourselves with a brief recital of the facts as offered by the government, which the jury substantially accepted as proven beyond a reasonable doubt, and a description of the defense offered on behalf of the appellant. Finally, we shall attempt to characterize briefly the conduct of appellant's trial counsel.

Agent Tanaka of the Drug Enforcement Administration (DEA) worked undercover as "Jimmy Rios" with an informer, Gerald Spendler. During November and December, 1978, appellant sold heroin to Tanaka on four occasions. Although the first three sales were made in San Francisco, the last such sale took place in Marin County, California, at which time a likely source of appellant's heroin was observed. A record-

* Honorable Helen J. Frye, United States District Judge for the District of Oregon, sitting by designation.

ed telephone conversation between Tanaka and appellant occurred on December 12, 1978, the day before the Marin County sale, during which appellant indicated anger at the prospect of Tanaka purchasing heroin elsewhere.

Apparently contact between Tanaka and appellant broke off thereafter and was not resumed until March 20, 1979 at which time negotiations were commenced for a substantially larger purchase of heroin than was made during 1978. A sale of heroin for $22,500 was arranged to occur on the evening of April 10, 1979. Tanaka and another agent, Dijamco, who previously had been introduced to appellant as Tanaka's partner, met appellant on that evening. Appellant got into the rear seat of the agents' car and they drove slowly down an alley.

At that point Davis Castro, a friend and associate of the appellant, appeared and followed the car on foot. The driver, Agent Dijamco, began to drive away; whereupon the appellant pointed a .38 revolver at the agents and told them to stop and put their hands on the dashboard. Thereafter Tanaka was shot in the head, a struggle for the gun ensued. In the struggle Tanaka was shot in chest and hand, Castro reached the car and tried to beat and choke Dijamco who shot Castro fatally four times and the appellant twice. Tanaka's gun was never fired.

Appellant's version of the events which he presented through his own testimony is that the 1978 sales were in fact made by Spendler, the informer, and that his apartment was loaned to Spendler in exchange for small amounts of heroin for appellant's own use. He explained that Spendler was afraid of Tanaka and had cautioned appellant always to placate him. This explains the December 12, 1978 recorded telephone conversation, appellant contended. Appellant also utilized his alleged fear of Tanaka in explaining his agreement to sell $22,500 worth of heroin on April 10, 1979. His version was that when he heard that Spendler had died in early April, 1979, he became even more afraid of Tanaka because he suspected Tanaka was responsible for Spendler's death.

With respect to the alley shooting, appellant contended he had no heroin with him when he got into the agents' car, a fact not disputed by the government, and also no .38 revolver, an assertion vigorously contested by the government. As appellant told it, Dijamco saw Castro approaching the car and shot him, at which point appellant attempted to take Dijamco's gun. During the struggle there were additional shots that wounded both Tanaka and appellant. Castro was merely an innocent bystander killed by an officer with too quick a trigger finger according to the appellant.

The government's case with respect to the four counts of heroin distribution was very strong while that supporting the two counts of assault depended largely upon the credibility of Agents Tanaka and Dijamco. The possession of firearm count was also supported by strong evidence in addition to the testimony of the two agents. Appellant's case rested almost entirely on his credibility.

Appellant's trial counsel were Messrs. Arthur D. Dempsey and Edward Solomon of San Francisco, California. Mr. Dempsey conducted appellant's defense, although the record reveals that Mr. Solomon participated in many conferences with the trial judge and prosecuting attorney. Although one cannot be certain, the record strongly suggests that Mr. Solomon in fact participated extensively in the preparation and presentation of appellant's defense. See R.T. IV, 51–6; VII, 96; XII, 886–97; XIII, 1219–29; XIV, 1321–22; XV, 1562–73. No criticism of his performance was expressed by the trial court nor by the Federal Public Defender in his brief or oral argument.

Mr. Dempsey presents an entirely different situation. The government acknowledges that he performed in an incompetent manner. It is difficult to describe his behavior in a comprehensive but brief manner. See Appendix. Perhaps the most apt single word is "shameless." He asserted his ignorance of federal trial court criminal procedure and frequently refused to adhere to proper procedures and techniques ex-

plained to him by an increasingly exasperated trial judge. His conduct normally ranged from near insolence to wounded innocence although on occasions it attained professional levels. More particularly, his objections frequently were repetitive and groundless, his infrequent statements of the law both imprecise and usually wrong, and his cross–examination of the government's witnesses confusing and often inflammatory. A frequent technique employed on cross–examination was to state several propositions that discredit the witness or the prosecution and then ask the witness if the statements were not true. Improper questions of a more specific nature were asked which, when objections thereto were sustained, were never properly formulated but merely dropped with an aside that suggested perhaps counsel did not know why he had asked the question in the first place. Frequently questions were interspersed with comments by counsel designed to cast doubt on the government's case.

This catalogue of deficiencies is continued in the appendix to this opinion, but it must be acknowledged that between Mr. Dempsey, Mr. Solomon, and the appellant, who also from time to time expressed his view on certain matters that arose during the course of the trial, the defense of the appellant was put before the jury in an understandable manner. Mr. Dempsey conducted the direct examination of the appellant in an acceptable manner although even this was marked from time to time with unprofessional conduct. This was the crucial part of the appellant's case. He stood or fell on his ability to convince at least one juror that Agents Tanaka and Dijamco were not telling the truth. He failed in this effort despite his counsel's efforts on numerous occasions to create doubt with respect to the government's case by suggesting that perhaps more shots were fired than the government acknowledged, that perhaps either Castro or appellant were kicked by officers who arrived on the scene following the shooting, that perhaps fingerprints had been removed from the guns, and that perhaps the government was not making important witnesses available. None of these

suggestions were supported by persuasive evidence, but Mr. Dempsey succeeded in sowing the seeds of uncertainty which he hoped would prevent appellant's conviction on some or all the counts.

A reading of the transcript provides substantial evidence to support the opinion of the trial court, expressed on several occasions, to the effect that Mr. Dempsey had the capacity to conform more closely to professional standards than in fact he did. *See* R.T. Vol. XIV, 1375; XV, 1383, 1554–55. An attorney who who voluntarily permits his conduct to drop below professional levels deserves discipline by the proper authorities. We, of course, make no finding that Mr. Dempsey conducted himself in this fashion. We only draw attention to the evidence reflected by this record. *See* Appendix.

## II.

## THE INCOMPETENCY OF COUNSEL ARGUMENTS

Appellant's arguments on this appeal require that we address two issues, *viz.*, should Mr. Dempsey's acknowledged incompetence require a reversal of appellant's conviction without regard to whether prejudice to his case can be shown and was appellant in fact prejudiced by Mr. Dempsey's incompetence.

### A. *Reversal Without Regard To A Showing Of Prejudice*

At the threshold of our treatment of these issues we wish to underscore once more our belief, based on an examination of the transcript of the trial, that Mr. Dempsey's conduct was flagrantly unprofessional. He obdurately refused to follow suggestions and instructions by the trial court despite the fact that frequently a school child could have understood and obeyed. Mr. Dempsey quite often simply did not choose to heed the advice of the trial judge. Obduracy may reflect conscious unprofessional conduct as well as involuntary ineptitude. The two should be kept distinct even though admittedly both may prejudice the client. To equate the two would provide an im-

proper incentive to use unprofessional conduct as a means to secure mistrials or reversals of convictions [1] having as the end the delay of a valid conviction or the possible escape from prosecution.[2] Obviously no bright line can be drawn between conscious unprofessionalism and incorrigible incompetency; each represents the opposing end of a spectrum in which at the center is ambiguous conduct that exhibits characteristics of both. The fact that much, if not all, of that spectrum is occupied by portions of the record of this case strongly suggests that those writers who assert that feigned incompetency presents no problem may be placing too heavy reliance upon an attor-

1. Several courts have expressed concern that lax standards for reversal of convictions on the ground of inadequacy of counsel would encourage such conduct. *E. g., Fitzgerald v. Estelle*, 505 F.2d 1334, 1336–37 (5th Cir. 1975); *Cross v. United States*, 392 F.2d 360, 367 (8th Cir. 1968).

2. Because we find that defendant was not prejudiced by his counsel's unprofessional conduct, no question of double jeopardy is raised by the disposition in this case. However, there is a strong possibility that double jeopardy claims will be raised in subsequent cases where the claim of inadequate assistance of counsel is raised successfully on appeal.

An extensive search reveals no federal case ruling on a claim raising double jeopardy as a bar to reprosecution following reversal of a conviction because of inadequacy of defendant's counsel. It has always been assumed that reversal for inadequacy of defense counsel falls within the policy of continuing jeopardy established by *United States v. Ball*, 163 U.S. 662, 671–72, 16 S.Ct. 1192, 1195–96, 41 L.Ed. 300 (1896), whereby a defendant who procures the setting aside of his conviction on the grounds of trial error is not entitled to plead that conviction as a bar to reprosecution for the same offense.

Although the road built by the Supreme Court is by no means a broad and well marked highway with respect to double jeopardy, a number of principles have remained reasonably constant. These are as follows:

A judgment of acquittal may not be appealed by the government and bars reprosecution for the same offense. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977); *Fong Foo v. United States*, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). A judgment of conviction, if not reversed or vacated, bars a subsequent prosecution for the same offense. *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (per curiam). A judgment of conviction that is reversed for trial error on defendant's appeal does not bar reprosecution by the government. *United States v. Ball*, 163 U.S. 662, 671–72, 16 S.Ct. 1192, 1195–96, 41 L.Ed. 300 (1896); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978); *United States v. Tateo*, 377 U.S. 463, 465–68, 84 S.Ct. 1587, 1588–90, 12 L.Ed.2d 448 (1964). A verdict of conviction reversed on appeal or on a motion for judgment n. o. v. bars reprosecution if the reversal amounts to a ruling that the verdict was based on insufficient evidence. *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *cf. United States v. Scott*, 437 U.S. 82, 90–91, 98 S.Ct. 2187, 2193–94, 57 L.Ed.2d 65 (1978) (dictum) (appellate reversal on ground other than insufficiency of evidence no bar to reprosecution). Mistrials requested by the defendant or declared because of manifest necessity, after due consideration of the defendant's right to have the proceedings against him concluded before a single trier of fact, do not bar reprosecution. *United States v. Perez*, 22 U.S. 256, 9 Wheat. 579, 6 L.Ed. 165 (1824); *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *see Arizona v. Washington*, 434 U.S. 497, 505–17, 98 S.Ct. 824, 830–36, 54 L.Ed.2d 717 (1978); *cf. Lee v. United States*, 432 U.S. 23, 97 S.Ct. 2141, 52 L.Ed.2d 80 (1977) (dismissal at defendant's request of faulty indictment no bar to reprosecution); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) (bad faith conduct by judge or prosecutor bars reprosecution where it threatens harassment by successive prosecution). Unless separate trials are procured by defendant, separate prosecution by one sovereign for offenses comprising the same factual elements is barred by the double jeopardy provision of the Fifth Amendment. *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

The Court's apparent vacillations have been occasioned not by disagreements concerning the foregoing principles but by divergence as to the lines fixing their boundaries. *See, e. g., United States v. Scott*, 437 U.S. at 101–16, 98 S.Ct. at 2199–2206 (Brennan, J., dissenting); *Sanabria v. United States*, 437 U.S. 54, 80–81, 98 S.Ct. 2170, 2186–87, 57 L.Ed.2d 43 (1978) (Blackmun, J., dissenting).

Were appellant's conviction to be reversed on the ground of ineffectiveness of counsel, it might be argued that the reversal amounted to either a reversal for insufficient evidence or a mistrial procured by prosecutorial wrongdoing. We, of course, express no opinion on the validity of such arguments, but their existence supports the possibility set forth in the text.

ney's attachment to his reputation among professionally responsible attorneys. *See* Simpson, *Standards of Attorney Competency in the Fifth Circuit*, 54 Tex.L.Rev. 1081, 1108–12 (1976); Note, *Effective Assistance of Counsel*, 49 Va.L.Rev. 1531, 1540–41 (1963). This possibility has been recognized. *See* Comment, *Ineffective Counsel's Last Act–Appeal? An Ethical Dilemma of Conflicting Interests*, 1979 Ariz.St.L.J. 595, 599.

■ Turning now to the specific arguments of the appellant, we confront the allegation that the trial court erred in not substituting new trial counsel in view of the "irreconcilable conflict" between appellant and his counsel. We reject this contention because our careful review of the record reveals no such conflict. While it is true that the appellant suggested on several occasions that Mr. Dempsey should be removed, *see* R.T. Vol. IX, 121–26; XI, 598–99, there was no effort to press these suggestions forcefully[3] and at one point appellant indicated that the trial should proceed and he would decide later whether he wished new counsel. R.T. Vol. XI, 612. Rather than "irreconcilable conflict," the record strongly suggests that the appellant cooperated with counsel and participated actively in his own defense.

■ The allegation that the trial court was guilty of reversible error in not conducting an inquiry concerning appellant's indigency is also without merit. Messrs. Dempsey and Solomon were retained counsel to whom, according to appellant, a fee had been paid by his family. The trial court was quite right in declining to discharge retained counsel on the eve of the

trial.[4] That being so, an inquiry concerning appellant's indigency was not required. Nor was it reversible error to refrain from removing counsel and ordering a full or partial refund of the fee. It bears repeating that appellant was represented by two counsel, the conduct of one of whom, Mr. Solomon, neither was censured by the trial court nor criticized by the appellant on this appeal. The record suggests, as already indicated, that Mr. Solomon was more than a mere subordinate of Mr. Dempsey. This dual representation, Mr. Solomon's manifested competence, the appellant's ambiguity with respect to his desires respecting representation, and the need to press forward with expediting the trial plainly justify the course of action employed by the trial court.

■ Finally, appellant argues that the requirement that attorney incompetence prejudice the defendant, imposed by *Cooper v. Fitzharris*, 586 F.2d 1325, 1331–32 (9th Cir. 1978), should not exist in a direct appeal from a conviction in which it is admitted by the government that counsel was incompetent. Appellant correctly points out that a collateral attack on a state conviction was the situation in *Cooper v. Fitzharris*. We fail to see why there should be a difference between direct appeals and collateral attacks with respect to the requirement of prejudice. *Cooper v. Fitzharris* suggests no such difference. Moreover, this court in *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979), stated:

"The touchstone here, as *in all cases where ineffective assistance of counsel is alleged*, is a fair trial. Where no single error or omission of counsel, standing alone, significantly impairs the defense,

---

**3.** In *Meeks v. Craven*, the court found: "An 'unequivocal' demand to proceed *pro se* should be . . . sufficiently clear that if it is granted the defendant should not be able to turn about and urge that he was improperly denied counsel. . . . We can find no constitutional rationale for placing trial courts in a position to be whipsawed by defendants clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules." 482 F.2d 465, 467–68 (9th Cir. 1973).

In *United States v. Jones*, this court applied that reasoning to a request for change of defense counsel at the end of the government's case. 512 F.2d 347, 350–51 (9th Cir. 1975). We find similar reasoning equally apt in this case.

**4.** *United States v. Michelson*, 559 F.2d 567, 572 (9th Cir. 1977); *cf. Chambers v. Maroney*, 399 U.S. 42, 53–54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) (no *per se* reversal for late appointment or substitution of counsel).

the district court may nonetheless find unfairness—and thus prejudice—emanating from the totality of counsel's errors and omissions." (italics added)

In *Ewing* we refused to eliminate the prejudice requirement even when "total" lack of preparation is alleged. We likewise refuse to eliminate it in those instances in which the issue of competency is raised on direct appeal.

The principal argument for doing otherwise is that on direct appeals we can assert our inherent supervisory powers and avoid applying the demanding constitutional commands of the Sixth Amendment which were recognized in *Cooper v. Fitzharris*. Utilization of our supervisorial powers would enable us, the argument continues, to fashion a standard of competency of a reasonably particularized and objective sort. Undoubtedly a checklist would emerge by which competency would be determined in an objective and somewhat mechanical fashion.

We decline to undertake the task of designing this checklist to be employed in direct appeals just as we did in *Cooper v. Fitzharris* for collateral attacks on convictions. The administration of a checklist would be difficult; the pressure to add deficiencies to those already requiring automatic reversal of a conviction would be great and, without regard to the length of the checklist, the coexistence of incompetency and prejudice would require reversal in any event. Finally, we simply do not agree that nonprejudicial acts of incompetency of counsel should be a basis for reversal of convictions even when brought to the attention of the court on direct appeal. As we said in *Ewing*, fairness of the trial is the touchstone, not compliance with an objective standard of competence. The trial and conviction of wrongdoers in a constitutional manner, although perhaps not in a professionally impeccable one, is more important than employing the criminal justice system as a post–admission training facility for attorneys.

### B. *The Absence of Prejudice*

It is obvious that appellant was not without counsel. It follows, as we pointed out in *Cooper v. Fitzharris*, that the ineffectiveness of counsel must have prejudiced the appellant. It should be apparent that we believe, and now so hold, that the appellant was not prejudiced by Mr. Dempsey's incompetent behavior on numerous occasions. We have reviewed the record and transcript of the trial very carefully before reaching this conclusion.

As pointed out earlier, the appellant's case depended almost entirely on his credibility. Efforts were made by Messrs. Solomon and Dempsey to obtain witnesses who could corroborate appellant's version of the events. These efforts failed, although the witnesses produced by the defense did not contradict appellant's version. The unprofessional conduct of Mr. Dempsey ordinarily occurred at such times, and took such forms, so as not to obscure the appellant's basic defense. His cross–examination of prosecution witnesses was confusing and unprofessional in many instances, but his direct examination of the appellant was professionally acceptable although not highly competent. *See* Appendix. Throughout the trial Mr. Dempsey by many means, many of which amounted to unprofessional conduct, kept before the jury the basic defense theory of the case, *viz.*, that appellant was framed by federal agents and local police.

In holding that appellant was not prejudiced by Mr. Dempsey's incompetence we are required to conclude that his many unprofessional acts when reviewed in the context of the entire trial did not deprive appellant of a fair trial. On the basis of our careful review we so conclude. The appellant received a fair trial. That is all to which he is entitled.

### III.

The trial court deserves praise for preserving the fairness of the appellant's trial. Despite Mr. Dempsey's provocative conduct which understandably frequently irritated the trial court, at no time did the court permit this irritation to become directed toward the appellant or any way compro-

**154**

mise its impartiality. Again and again the trial court, following a deviation from proper conduct by Mr. Dempsey, got the trial properly underway once more. In sum, the appellant did not suffer as a result of Mr. Dempsey's behavior but the trial judge most certainly did.

Conduct, such as that of Mr. Dempsey, should not be tolerated. We recommend that the District Court for the Northern District of California institute proceedings, assuming it has not already done so, to remove Mr. Dempsey from the roll of those attorneys admitted to practice before it. Following the termination of these proceedings this circuit will consider whether to institute similar proceedings with respect to Mr. Dempsey's membership in the bar of this court.

We also direct the Clerk of this court to forward a copy of this opinion to the State Bar of California.

Affirmed.

## APPENDIX

Examples of Conduct of Attorney Dempsey As Appear in the Reporter's Transcript Suggesting Both Competence and Incompetence.

| Conduct | Vol. | Page |
|---|---|---|
| Unfounded suggestion in pretrial proceedings that federal proceedings were proceedings "removed" from state court. | III | 4 |
| Inadequate understanding of Rule 16, F.R.Crim. evidenced in pretrial proceedings. Questioned by trial judge as to competency to try case. | III | 8, 9, 10, 24, 25 |
| Confused arguments concerning discovery during pretrial proceedings leading to trial judge suggesting that counsel might be removed. | V | 58–60 |
| Pretrial argument on venue based on pretrial publicity effectively presented. | V | 80 |
| Unprofessional insistence on rearguing points in pretrial proceedings already ruled on by trial court. | VI | 89 |
| Unprofessional conduct and argument to trial judge. | VII | 98–99, 102, 108 |
| Motion based on a far-fetched application of *Miranda.* | VII | 110 |
| Improperly tendered jury instructions. | VIII | 116–18 |

| Conduct | Vol. | Page |
|---|---|---|
| Unprofessional confrontation with trial judge concerning the proper manner to subpoena witness. | IX | 127–28 |
| Proper and competent behavior during voir dire including rational use of peremptory challenges. | IX | 168–307 |
| Unprofessional conduct regarding the payment of fees to serve subpoenas. | X | 347–48 |
| Unprofessional aside remark in presence of jury followed by warning by trial judge that a finding of contempt might follow. | X | 547–48, 549–55 |
| Heated exchange with trial judge over cross-examination of a government witness. | XI | 593–98 |
| Unprofessional objection to trial judge's consultation with defendant regarding representation afforded him. | XI | 601 |
| Defective cross-examination technique. | XI | 625–27 |
| Reasonably effective cross-examination. | XI | 637–67 |
| Improper objection. | XI | 739 |
| Unprofessional aside remark in presence of jury denigrating government's proffered evidence which led to a finding of contempt. | XII | 882 |
| Acceptable cross-examination. | XIII | 989–90 |
| Use of argumentative and testimony-laden question in cross-examination, a tactic fairly frequently used. | XIII | 1016, 1151 |
| Acceptable direct examination of a defense witness. | XIII | 1110–14, 1120–32 |
| Acceptable professional direct examination of defendant during which basic defense developed. Some unprofessional questions and asides interspersed, however. | XIII XIV | 1138–1216 1233–1321 |
| Objection by counsel to unprofessional type of question when arguably put by prosecuting attorney. | XIV XV | 1328, 1351 1435 |
| Unprofessional objections during cross-examination of defendant by prosecution. | XIV | 1348–49 |
| Unprofessional comments on behavior of prosecution during cross-examination of defendant. | XIV | 1374 |
| Professional direct examination of a defense witness. | XV | 1467–73 |
| Correction in a professional manner of an improperly put question. | XV | 1482–83 |
| Unprofessional outburst. | XV | 1514 |
| Conduct described by trial court as "professionally obstreperous and obnoxious." | XV | 1519–20 |
| Unprofessional effort to utilize trial court's rulings against counsel and criticism of counsel's unprofessional conduct in closing argument to jury. | XVI | 1662 |